E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
KERRY L. QUINN (Cal. Bar No. 302954)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-5423
    Facsimile: (213) 894-6269
    E-mail:   Kerry.L.Quinn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 21-151-RGK-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | |
| ADOLFO SCHONEKE, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney and Assistant United States Attorney Kerry L. Quinn, hereby files its sentencing position for defendant ADOLFO SCHONEKE.

    This sentencing position is based upon the attached memorandum of points and authorities; the files and record in this case; and

//

//

//

//

such further evidence and argument as the Court may permit at the hearing on defendant's sentencing.

Dated: October 19, 2022          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


                                    /s/
_____
KERRY L. QUINN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**Contents**

TABLE OF CONTENTS...................................................1

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.   INTRODUCTION..................................................1

II.  STATEMENT OF FACTS............................................1

III. ARGUMENT....................................................12

     A.   Advisory Sentencing Guidelines........................12

          1.   The Sophisticated Means Enhancement Should Apply....13

          2.   A Leader/Organizer Role Adjustment Should Apply.....14

     B.   Analysis of the § 3553(a) factors.....................15

          1.   Nature and Circumstances of the Offense............16

          2.   Deterrence.........................................17

          3.   Defendant's History and Characteristics............17

IV.  RESTITUTION..................................................18

V.   CONCLUSION...................................................18

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.     INTRODUCTION**

3      On May 5, 2022, defendant ADOLFO SCHONEKE ("defendant") pled

4 guilty pursuant to a plea agreement [docket no. 109] (the "Plea

5 Agreement") to Count One of the indictment charging him with

6 conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  On

7 June 27, 2022, the United States Probation and Pretrial Services

8 Office ("USPO") filed a Presentence Report [docket no. 113] ("PSR"),

9 proposing a total offense level of 24 under the United States

10 Sentencing Guidelines ("USSG") and calculating defendant's criminal

11 history category ("CHC") at level III.  The government concurs in the

12 PSR's criminal history calculation, but it respectfully submits the

13 Court should impose, in addition to the enhancements recommended by

14 the USPO, a +2 sophisticated means enhancement under USSG

15 § 2B1.1(b)(10)(C) and a +4 role adjustment under USSG § 3B1.1(a).

16 The government submits the resulting offense level should be level 30

17 with a guideline range of 121 to 135 months, and the government

18 recommends a low-end sentence of 121 months.  The government is

19 attempting to reach a stipulation on restitution, but it will file a

20 separate statement on restitution if a stipulation cannot be reached.

21

**II.    STATEMENT OF FACTS**

22      Defendant committed a heinous offense, and he deserves a prison

23 sentence of 121 months.  The fraud scheme he invented, proposed to

24 his co-conspirators, and carried out involved uniquely devious means

25 designed to steal money from as many victims as possible.  Playing on

26 the dream of home ownership and seemingly out of reach home prices,

27 defendant figured out a way to "sell" homes that he did not own and

28 had no business in listing for sale.  Neither he nor his co-

conspirators had any intention of actually selling homes to the victims, but they nevertheless found ways to market homes as though they were for sale, using licenses of complicit or elderly (or dead) real estate brokers to list the homes on real estate industry websites.  In a particularly devious part of the scheme, they even found ways to hold open houses in the not-for-sale homes (sometimes paying occupants or otherwise deceiving occupants or owners to allow the homes to be used for open houses).  They then accepted down payments from multiple victims for each of the homes, forging sellers' signatures on sales contracts, and they strung victims along for months or years at a time with fake updates on a fake, protracted closing process for the fake transactions.  When victims figured out what happened and demanded their money back, they simply changed aliases, fake businesses, and addresses, and began the scheme at a new location.  In this way, they defrauded approximately 400 victims out of more than $6 million.

<u>Background</u>

Defendant was one of the leaders and organizers of this scheme. He came up with the idea for it and directed others in carrying it out.

To carry out the fraud, defendant and his co-conspirators operated real estate and escrow businesses including businesses operating under names such as West Coast Realty Services, MCR, Golden Realty, Golden Star Escrow, American Investments, Allstar Escrow, Elite Escrow, Pride Financial, and Seaside Realty.  They operated the businesses out of offices in Cerritos, La Palma, and Long Beach.

As part of the fraud, defendant and his co-conspirators used real estate listing services such as the multiple listing service

("MLS"), which was a database used by real estate brokers and others in the real estate industry to list and find properties for sale.

Another part of the scheme involved open houses held at the homes the co-conspirators used as part of the fraud.  An open house was a marketing technique used to market properties to potential purchasers, allowing purchasers to view properties before purchasing them, typically in a drop-in fashion during a designated time period.

Escrow companies and the escrow process was another key aspect of the fraud.  As relevant to the instant offense, an escrow was a contractual arrangement in which a third party received and disbursed money for the primary transacting parties, with the disbursement dependent on conditions agreed to by the transacting parties.

Down payments or earnest money deposits, which were deposits paid as part of sham real estate sales, were also integral to the fraud.  As relevant here, down payments were made into what victims believed were escrow accounts (but were in reality accounts the co-conspirators controlled and from which co-conspirators intended to and did steal money); victims made these deposits toward the purchase price for the property, following what they thought was the acceptance by the seller of their offer to purchase the home.

Similarly, the co-conspirators marketed the sales transactions as so-called "short sale" opportunities, where a short sale was a sale of property for a price less than the amount outstanding on a mortgage loan secured by the property.  A short sale required approval of the mortgage lender holding the mortgage loan, and this requirement could delay the process for finalizing such a sale.

<u>Offense Conduct</u>

As further detailed in the Plea Agreement and the PSR, the offense conduct involved a conspiracy to commit wire fraud through a devious and devastating real estate scheme.  That is, from at least November 2013 to December 2016, defendant, his sister Blanca Gonzalez aka Bianca Schoneke ("B. Gonzales"), Mario Gonzalez (no relation to B. Gonzalez) ("M. Gonzalez"), co-conspirator No. 1 ("CC-1") and others (collectively, the "co-conspirators"), conspired with each other to commit wire fraud and engaged in a scheme to defraud would-be purchasers of residential properties (the "victims") by marketing properties to the victims that were not properties the co-conspirators were authorized to sell.  In furtherance of the scheme, they stole money victims transferred to them, often by interstate wire, toward the fake purchase price.

Defendant provided the idea for the scheme, and worked with others, including B. Gonzalez and M. Gonzalez, to help carry it out. The co-conspirators also hired office workers to help them carry out aspects of the scheme, and at least some of the office workers were complicit in it.

As part of the scheme, defendant and other co-conspirators identified properties that could be marketed to the victims even though the co-conspirators did not intend to sell or to facilitate the sale of the properties to the victims and in at least some instance the properties were not for sale and/or the co-conspirators did not have a relationship or agreement with the owners allowing them to market the properties for sale.

Defendant and other co-conspirators marketed the properties to the victims using M. Gonzalez's broker's license and the licenses of

other brokers.  Using the brokers' licenses, the co-conspirators listed the properties on the MLS at prices that were below market value to generate interest from prospective purchasers, marketing the properties as short-sale opportunities.

In some instances, B. Gonzalez, M. Gonzalez, and others working at their direction arranged to make the properties available for open houses and other showings and held the open houses and other showings at the properties.  In other instances, the co-conspirators marketed the properties as sight-unseen favorable sales opportunities.  To the extent open houses or other showings were held, the co-conspirators and others working at their direction sometimes paid money to the owners and/or occupants of the properties to allow open houses to be held and the properties to be shown.

In order to facilitate the scheme, the co-conspirators purported to accept, on behalf of the supposed sellers of the properties, multiple offers from multiple victims to purchase each of the properties, concealing this fact from all of the victims, and instead indicating to each victim that his or her offer had been the only one accepted.  The co-conspirators also falsely represented to the victims that the down payments would be held in escrow accounts for safekeeping and until the transactions closed.

In contrast to the misleading representations to victims, the co-conspirators controlled the accounts into which the victims' money was deposited and transferred and the victims' money would be withdrawn by and distributed among the co-conspirators and others working for them without the victims' knowledge or authorization.

The co-conspirators further misled the victims by falsely representing that they were working to try to finalize the sales,

falsely telling the victims that they were working with mortgage lenders to try to obtain short-sale approvals.  The co-conspirators used these false representations to explain delays in the purported sales transactions.

B. Gonzalez provided scripts to co-conspirators and others working at their direction so they could provide fake updates to victims about the status of the fake short sale approval process and the fake short sale transactions. The co-conspirators and others working at their direction provided these fake updates to victims.

At the co-conspirators' direction, the office workers would open bank accounts in their own names to hide the co-conspirators involvement in the fraud.  The co-conspirators would use the bank accounts to collect money from victims, which they converted to cash, and divided the proceeds among themselves and others working for them.  In this way, defendant and other co-conspirators converted victims' money into cash in order to make the proceeds harder to trace and to hide their involvement in the transactions.

When victims realized what happened and demanded their money back, the co-conspirators returned some money to certain victims.  In order to continue the fraudulent scheme, however, the co-conspirators changed the location of their offices, the name of the broker and brokers license used to list properties and their business names.

Defendant and his co-conspirators used numerous properties to further the fraudulent scheme, and collected more than $11.7 million from victims as part of the scheme (involving more than 860 transfers from approximately 750 or more victims).  Although some of the victims were paid back, the scheme caused more than $6 million in losses to nearly 400 victims.  The final restitution amount will be

slightly less than this, approximately $5.8 million because the particular victims associated with some of the fraudulent transfers could not identified.

Victim Impact

The government has received victim impact statements from numerous victims and will be filing those under seal.  Excerpts of some of the victim impact statements are below (any grammatical or spelling mistakes are from the original, with the statements excerpted in the victims' own words):

H.C.

The theft of my deposit broke my heart and that of my wife too. We were, finally, so sure that with our deposit, down payment and finances in place we were going to obtain this house.  We were almost ready to call that house, home.

After the lost of our deposit, I developed anxiety attacks when I kept thinking how many years would it take me to make the same money that I had lost and complete for the down payment of another house.  I felt I couldn't breath.  It was ugly when I felt that I couldn't inhale the oxygen under my nose.  The worst thing was that the prices of the houses kept on increasing so the down payment needed to be higher each month.

I also started to develop a lot of negative thoughts, which started to affect my health and personal life.  I lost a lost of weight and had many restless nights with many arguments with my wife when we touched the subject of the lost deposit each blaming the other.

This whole experience left a scar in my life....

1        <u>R.R.</u>

2        I was a victim of the Adolfo Schoneke real estate scam in 2016.

3  Sometime during August 2016 I met Adolfo and talked to him about my

4  interest in purchasing a property for my family.  He then provided

5  options and represented me as my real estate agent.  I believed every

6  suggested option he had available for me as I thought he had the best

7  interest for me and my family.  . . . In August 2016, he found a

8  property for sale in La Puente, we opened escrow and I signed the

9  required documents to proceed with purchase.  The price was right and

10 I was extremely happy. . . . In Sept 2016 he called me stating

11 everything was almost finalized and that I needed to wire money to

12 proceed with the transaction.  He provided account details and I went

13 ahead and did the wire transfer of $40,000.  We were in contact and

14 he said it takes a while for the bank to finalize the transaction.

15 I was patient and continued to wait.  I cannot recall the time I

16 waited but I was getting frustrated with how long the process was

17 taking and communication with Adolfo was slowly not there anymore.  I

18 then decided to show up at the escrow office in Long beach, CA and

19 the doors were shut and nobody was there to assist.  Adolfo's phone

20 was unavailable/disconnected and he was nowhere to be found. . . . I

21 was stressed, angry and in a financial hole after all of this.  I was

22 emotionally saddened for years and still continue to be emotionally

23 stressed about the outcome and not having resources or help for this

24 situation.  My family was impacted by this and still it is very hard

25 to trust anyone for real estate transactions.  My family missed the

26 opportunity to purchase a home since he left us financially drainned.

27

28

1    S.S.

2        As an immigrant to the United States, I worked hard for many

3    years so that one day I could buy a home and thereby ensure stability

4    and security for both me and my family.  However, due to the criminal

5    actions of the defendant, Adolfo Schoneke, thousands of hours of

6    blood, sweat, tears, and hard work I put in for my family was taken

7    away by a single action.  My family has lost thousands of dollars,

8    which impacted us financially immediately after this incident and

9    will be problematic for years to come.  I'm the sole breadwinner.

10   Unfortunately, as a senior citizen, I do not have the physical

11   ability to work the same long hours to save money like before; the

12   money that was stolen from us by the defendant could have helped us

13   tremendously, especially during the pandemic, towards all our

14   household expenses.

15       The money stolen from us would have put food on the table, paid

16   more bills, put more gas in our car, and would have prevented

17   immeasurable stress and anxiety.  This experience has negatively

18   impacted the mental and physical health of me and my family.  We

19   don't sleep at night thinking of the money we lost and worrying about

20   how we will afford our lives.  There is a lot of guilt, shame, anger,

21   and embarrassment to being a victim, but the worst part is that I

22   will not have anything to leave my family to keep them safe and

23   secure when I am gone.

24   O.T.

25       The crime impacted my life in an economic and emotional way.  I

26   was interested in purchasing a house and wired $10,000 for the

27   closing costs of the property.  When I found out it was fraud it

28

started affecting me with loss of sleep and increased stress.  Due to that my health was affected.

W.T.

This statement is very hard for me to address and write.  The real estate fraud . . . has greatly affected my life.  My loss of $241525.00 had a big impact on my life.  In the four years since the fraud, I have been unable to sleep.  Often I needed to take medication to help me go to sleep.  It had always been my dream to purchase a house of my own.  I want to provide my family with a comfortable house.  For past twenty-five years, I have been working hard at many odd jobs and saving in the hope of someday buying a house.  Then it was so devastating to lose lifetime saving of $241525.00 to the real estate fraud.  I know it is no longer possible to purchase the home.  Knowing this, I was not able to concentrate on my work.  Then I lost my job.  My family also have suffered due to the fraud.  We are no longer able to trust people like we did before. I often cry and my health has been deteriorating.  My family is constantly looking to help me recover from this emotional and financial trauma.  Bianca Gonzalez should not be able to get away with fraud.  She and her accomplices must pay back to honest hard working individuals like myself and should be punished to the fullest extent of the law.  This type of fraud must be stopped.

V.Z.

The shattering of my American dream started in May of 2016, when I believed a scammer to a "good deal" to purchase my first house, that resulted in the loss of all my life saving of $100,000.00 and financial distress for my parents. Every time I thought of it, I could not help to stop the tearing flowing down my face. My thoughts

10

are so mixed with sorrow, regret, angry, self-blame, and letting my parents down. Mostly, I am worried about my future, as the economical condition is turning hard and I am jobless.

I am an immigrant from China. I came to United State for schools in year 2000. In the first 3 years, I attended school to learn English and professional skills with the support from my parents in China. In 2003, I got my first job in a piano factory, earning $6 per hour. I was so proud that I could stand on my own feet. I could finally support myself financially! My American dream had begun. I dreamed that one day I could own an apartment/house of my own, so I worked at the factory during the day, and repair piano for churches and schools after the hour. After more than 10 years' effort and saving, with my parents' financial support, I finally had enough money for a down payment to start realizing my American dream. Sadly, this is when my nightmare began.

Even now 6 years have passed, I still remember every detail of what I had experienced. After seeing the houses twice, I was pressured and paid $100,000 . . . After six months, I started realizing that I was deeply into a scam. I am afraid not only that I could lose my whole life's saving, but also that I could loss that chance to reunite with my parents in US forever.

I am so disappointed at myself, for that I was so foolish and got sucked into a scam. I had started by wanting to provide a good home for me and my parents, but ended with losing my lifesaving. At the same time, I led my parents into financial distress. This is such a tormenting experience for me. I could not bring myself out of it for a long time. I found myself no longer can trust anyone. I am so depressed, and have no interest in anything. I could not even

11

concentrate on my work. Now that I am jobless, lost my job in such a economic down turn. I really do not know where future is. I can only hope that these scammers can be locked up forever so they can not hurt anyone anymore.

## III. ARGUMENT

As explained below, the government recommends that defendant be sentenced to a term of 121 months' imprisonment, followed by a three-year period of supervised release, and that the Court order restitution in an amount to be determined.

### A.    Advisory Sentencing Guidelines

Based on the stipulations in the Plea Agreement and the facts referenced above, the government submits that the following advisory sentencing guidelines apply:

| | | |
|---|---|---|
| Base Offense Level: | 7 | USSG §§ 2X1.1, 2B1.1(a)(1) |
| Fraud loss is greater than $3,500,000 but less than or equal to $9,500,000 | +18 | USSG § 2B1.1(b)(1)(J) |
| 10 or more victims | +2 | USSG § 2B1.1(b)(2)(A) |
| Sophisticated means | +2 | USSG § 2B1.1(b)(10)(C) |
| Role enhancement | +4 | USSG § 3B1.1(a) |
| Acceptance of Responsibility | −3 | USSG § 3E1.1(a), (b) |
| Total Offense Level | 31 | |

The government agrees with the USPO in its reasoning for the base offense level and application of the loss and victim enhancements, but the government submits a +2 sophisticated means enhancement should apply along with a +4 leader/organizer role adjustment.

1            1.   <u>The Sophisticated Means Enhancement Should Apply</u>

2     Section 2B1.1(b)(10)(C) provides that a +2 enhancement should

3 apply where "the offense otherwise involved sophisticated means and

4 the defendant intentionally engaged in or caused the conduct

5 constituting sophisticated means."  The Commentary further provides:

6 "'sophisticated means' means especially complex or especially

7 intricate offense conduct pertaining to the execution or concealment

8 of an offense," and it lists examples such as "hiding assets or

9 transactions, or both, through the use of fictitious entities [or]

10 corporate shells."

11     In this case, defendant came up with the idea for the scheme,

12 and he recruited and worked with others to help carry it out.  The

13 scheme included using fake real estate and escrow companies to market

14 homes that were not for sale and that the co-conspirators did not

15 intend to sell.  It also involved using aliases and fake entities to

16 list the homes for sale, and then using these same fake aliases and

17 entities to collect down payments from multiple victims for the same

18 not-for-sale homes.  The scheme further included using real estate

19 licenses of complicit or elderly (or dead) real estate agents to list

20 the homes on MLS and, through a variety of devious means, to hold

21 fake open houses at the not-for-sale homes.  This defendant-designed

22 scheme further included listing the homes at below-market prices to

23 generate sales interest and falsely representing the sales were

24 short-sale opportunities to give victims a fake reason why the

25 transactions would be delayed, with co-conspirators giving fake

26 updates on the fake short sale approval process.  In some instances,

27 victims were induced to transfer the full "purchase price" to

28 accounts the co-conspirators controlled.  As envisioned and directed

by defendant, the co-conspirators and office workers working for them withdrew fraud proceeds in cash and distributed the proceeds among themselves.  This scheme included numerous aliases and fake companies, as the co-conspirators simply changed aliases, fake business names, and office locations when victims figured out what happened and demanded their money back.  This highly deceptive and unique scheme was so convincing that the fraudulent techniques defendant invented induced victims to transfer over $11.7 million (spread over more than 860 transfers and involving approximately 750 investors induced to transfer money) into bank accounts they controlled, involving more than $11.7 million in fraudulently obtained proceeds.  Although some victims were paid back, the total losses still exceeded $6 million and involved approximately 400 victims who lost money.

This scheme – with all the aliases, fake companies, fake MLS listings, fake open houses, fake escrow accounts, fake short sales, and other deceptive means – is quintessentially a "sophisticated" scheme and warrants the +2 sophisticated means enhancement.

      2.   <u>A Leader/Organizer Role Adjustment Should Apply</u>

Defendant was a leader and organizer of this scheme.  He came up with the idea for it, directed others in carrying it out, and reaped a lion's share of the profits.  The profits were all liquidated to cash, so a precise accounting is impossible, but all the participants who have given statements reported defendant was one of the leaders and organizers of the scheme and he kept a large share of the profits – estimated at $3,000 or more a week.  The scheme involved more than 5 participants, including the three people who were charged, CC-1, and several office workers who also bore criminal liability, and for

the same reasons described above, it was also "otherwise extensive."
In these circumstances, a +4 role enhancement under USSG § 3B1.1(a)
should apply.

   **B.   Analysis of the § 3553(a) factors**

   The government submits that a sentence of 121 months is
sufficient but not greater than necessary to comply with the
sentencing goals set forth in 18 U.S.C. § 3553(a).

   The factors to be considered when imposing sentence, as set
forth in 18 U.S.C. § 3553(a), include:

   (1) The nature and circumstances of the offense and the
   history and characteristics of the defendant;

   (2) The need for the sentence imposed –

       (A) to reflect the seriousness of the offense, to
   promote respect for the law, and to provide just punishment
   for the offense;

       (B) to afford adequate deterrence to criminal conduct;
   [and]

       (C) to protect the public from further crimes of the
   defendant . . .

   (3) The kinds of sentences available;

   (4) [the applicable sentencing guidelines];

   (5) [the applicable sentencing guidelines policy
   statement];

   (6)  The need to avoid unwarranted sentence disparities
   among defendants who have been found guilty of similar
   conduct; and

   (7)  The need to provide restitution to the victims of the
   offense.

18 U.S.C. § 3553(a).

   In addition to the sentencing guidelines, discussed above,
factors important to the government's sentencing recommendation are
discussed below.

1            1.  <u>Nature and Circumstances of the Offense</u>

2        The fraud scheme defendant invented and committed was horrible.

3    It had a devastating impact on his victims.  The number of victims

4    itself is astounding and shows the wide-ranging havoc defendant's

5    scheme wreaked, but the individual victim stories are just as heart

6    wrenching.  Some victims lost their entire life savings – savings

7    victims had accumulated over a lifetime of work in hopes of being

8    able to purchase a home for themselves and their families.  Many

9    victims lost the ability to provide for themselves and their

10   families, and some were left without the money they had saved or the

11   ability to recover from the financial loss.  All the victims reported

12   suffering significant financial harm.  Many victims were left

13   financially destitute from the fraud, no longer able to fulfill

14   lifelong dreams of home ownership or to be able to provide financial

15   safety and stability for their loved ones.  Many victims have

16   reported suffering emotional trauma and other mental, emotional, and

17   physical hardship, with their families also impacted, and

18   relationships with loved ones damaged.  Many also reported loss of

19   trust, shame, guilt, or embarrassment.  More than 750 people were

20   taken in by the scheme, and approximately 400 victims actually lost

21   money.  More than $6 million is gone.  The government is separately

22   submitting victim impact statements submitted in this case, and as

23   detailed above, these statements detail the devastating impact

24   defendant's criminal conduct had on his victims.

25       Defendant's criminal conduct was reprehensible and cruel,

26   leaving victims financially devastated and unable to recover from the

27   fraud, with nearly all victims reporting they suffered devastating

28

consequences – financial and otherwise – from the fraud scheme.   A
sentence of 121 months is warranted.

    2.   Deterrence

    A 121-month sentence will also send a strong deterrent message
to defendant and to others who might engage in similar conduct.   Real
estate fraud is a significant problem in this district, and criminal
prosecution is one of the only ways to deter it, especially in
circumstances such as this, where criminals go to great lengths to
try to deceive victims and use deceitful means to keep fraud schemes
going.   The Court can and should impose a significant sentence to
send a strong deterrent message to discourage fraud like the ones
defendant committed.

    3.   Defendant's History and Characteristics

    Defendant deserves a sentence of 121 months.   This is not a low-
level participant or first-time offender.   Not only does defendant
have a long history of behavior putting others at risk (such as drunk
driving), the offense conduct was a continuation of another
investment fraud scheme defendant ran using other fake companies,
including a company called Starlight Financial.   It further appears
defendant continued to engage in fraudulent real estate transactions
until very recently as detailed in filings submitted regarding the
government's request for detention in this case.   Defendant asks this
Court for leniency because of his alcohol consumption, which he says
contributed to the offense conduct in this case.   But alcohol
consumption is no excuse for the devastating financial fraud
defendant perpetrated on his victims, which continued over years and
involved millions of dollars in losses to numerous victims.
Defendant deserves a substantial punishment.

17

**IV.    RESTITUTION**

In addition to the period of incarceration, defendant should be ordered to pay restitution to victims.  The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A and § 3664, applies to "an offense against property under this title . . . including any offense committed by fraud or deceit."  18 U.S.C. § 3663A(c)(1)(A)(ii).  Under the MVRA, a district court must order restitution in such a case where "an identifiable victim or victims has suffered a . . . pecuniary loss."  18 U.S.C. § 3663A(c)(1)(B). With this statutory background, this Court is required to impose an order of restitution in this case in favor of the victims for the full amount of their losses, without consideration of the defendant's ability to pay. 18 U.S.C. § 3664(f)(1)(A); USSG § 5E1.1 (directing the sentencing court to enter a restitution order if there is an identifiable victim).  The government is seeking a restitution order in this case.  To streamline proceedings, the government is attempting to reach a stipulation on a final restitution amount, but it will submit a separate position statement on restitution if an agreement cannot be reached.

**V.    CONCLUSION**

For the reasons set forth above, the government recommends that defendant be sentenced to a 121-month term of imprisonment, a three-year period of supervised release, and ordered to pay restitution in an amount to be determined by the Court.